The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Okay, good morning everyone. The first argued case this morning is number 20, 1139, Bitmanagement Software GmbH against the United States. Mr. Raviv. Thank you, Your Honor. Good morning and may it please the Court. I'd like to focus on two points, each of which independently requires reversal in this case. First, the Navy undisputedly entered into a series of written licenses for Bitmanagement Software products. Those express contracts preclude the possibility of a separate implied license on the same subject matter. And because the written contracts themselves did not allow the Navy to make hundreds of thousands of copies of the software, the Court of Federal Claims erred in holding that there was an implied agreement to that effect separate and apart from the written contracts themselves. But even if the Court disagrees with that, there was a second independent problem. The express contracts required, as a condition of the Navy's license to the software, that the Navy use a licensing management program called Flexera to track and limit the Navy's use of Bitmanagement Software. The Navy admits it didn't do that. Instead, the copies were completely unrestricted as to their use. When the licensee of a copyrighted work fails to meet a condition of its license, it infringes the copyright. And that is what happened here. Either of these grounds, both the preclusion of the possibility of an implied license and the failure to meet a condition of the license, requires reversal here. Okay, but Mr. Raviv, this is Judge Dyke. Putting to one side the second point about the Flexera license, it is the case that the Court of Federal Claims finding, factual finding, that there was an agreement here manifested by the exchange of emails to an implied license is supported, is not clear error, is not clearly erroneous, that finding. Do you agree with that? I don't agree with that, Your Honor. And the first point I want to make is that the course of dealing-based conclusion based on the exchanges of emails is not relevant because the parties actually had expressed contracts that government had. I understand that argument. That's not what I'm asking about. I'm asking whether, as a factual matter, the finding of the Court of Federal Claims that there was an implied license here is supported by the facts, is not clearly erroneous. Do you agree with that? I don't agree with that. It may be insufficient under your argument, but as a factual matter, how can it be clearly erroneous? It was clearly erroneous because there was considerable evidence in the form of the contract that the parties actually drafted and executed, which did not themselves allow for mass copying of the software, and the fact that to the extent that management was aware that there would eventually be a large-scale deployment of the software, that management understood and was given good reason to understand that any additional copying of the software would be accompanied by payment for those additional copies above and beyond what was allowed for in the written licenses. Okay. But let's assume for the moment that we conclude that that finding is supported by substantial evidence. It is not clearly erroneous. And then your argument is there can't be an implied license where there's an expressed contract at the same time? That's correct. That's right. But there are various cases that hold that you can have an implied license resulting from conduct and exchanges between the parties, right? You can have an implied license that's not part of a contract, right? That's right, Your Honor. Yes. Okay. So in NMR and in the Fifth Circuit and based in case, that's been recognized, correct? Yes, Your Honor. You can have an implied license in the absence of an expressed contract. But when there is a written expressed contract, that does preclude the possibility of a separate implied license or implied contract with respect to the same subject matter. Well, the cases that you've cited only involve situations where you can't have two expressed contracts dealing with the same subject matter. They don't deal with an expressed contract and then a separate implied license, correct? There aren't that many cases that deal with the particular question of a separate implied license. However, I'll direct Your Honor's attention to two cases that did address this issue. One of them was Intel Corp v. Broadcom, which you cited in the briefing, 173 F-subsecond 201, which addressed a case involving a patent license. And another case that addressed a very similar set of facts is a recent decision from the Eastern District of Pennsylvania, a case called Cashi v. McGraw-Hill. Okay. Right, and so the distinction here is that you've got one that's an expressed written contract, and then the question is can you overlay an implied contract on top of that, correct? That's correct, Judge O'Malley. And the key issue is whether the implied license deals with the same subject matter and whether it's completely unrelated to the expressed contract. And if the separate implied license is related to the expressed contract, and if it is related, then the implied license can exist. But I think that what you said is not quite right in the sense that I don't understand the Court of Federal Claims to have found or that the government is arguing that there was a separate contract that gave them a license. I think they're saying that there was an agreement or an implied agreement to give them a license, which was terminable and, in fact, was terminated later. Isn't that correct, that the argument is not that there was a separate contract, but that there was a separate license? That may be the Court's conclusion, but I don't see that as a meaningful distinction, Judge Dyke. When the parties have memorialized their agreement with respect to the subject matter, and here the subject matter was the Navy's authorization to copy and use the software product via Contact Geo, the possibility of a completely separate implied license is precluded. And, in particular here, the notion that there was a separate agreement, which BIT Management authorized the Navy to make hundreds of thousands of copies of this software in exchange for no compensation at all, is not plausible and is not what any rational software company would do. Isn't that really what we're talking about, that it was expected, and I think even hoped, that it would achieve this widespread dissemination and use, but that it wouldn't all be for the same fee that was paid for the initial 18 installations, that the $350,000 or whatever uses would be paid for at, I think you mentioned $305 apiece, or whatever might be negotiated, that the idea was not that it was prohibitive, but that it would be an additional charge. Is that correct? Well, it's correct that BIT Management had every expectation that it would be paid for the additional hundreds of thousands of copies that the Navy made beyond what the Navy had been authorized to make and had paid for in the original contract that it had executed. Where did it say that it expected to be paid for the ability to use a floating license? Paid extra. Where in the record do we find that? BIT Management, in a number of places, Judge Dice. As we explain in the briefing... No, but I'm asking you where specifically. I have looked for this, and I don't find any document that was transmitted to the Navy where they said, we expect to be paid extra for the use of this floating license. There was talk about being paid for additional licenses beyond the $38,000, but I don't see where in the record they told the Navy they expected to be paid more for the floating licenses. Could you show me where that is? In one place, Judge Dice, where the planned deployment schedule was emailed to BIT Management, the Navy's representative, Alex Viano, wrote, and I quote, looks like there will be great opportunity to increase the number of BF Contact Geo licenses in the future. And BIT Management reasonably understood that to understand that there would be additional license purchases corresponding to the additional copies that would be made. And I'd like to make one other point here, Judge Dice, where in a situation involving an implied license, at a minimum, there has to be a meeting of the mind here. And at most, what we had here was mutual misunderstandings. And even the government's own witness at trial, David Colleen of Planet Nine, acknowledged that BIT Management ultimately misunderstood what was going on. And that, before we run out of time in that respect, you argue here that they were obligated to use the Flexera software and they didn't. So on that point, don't we have an impossibility situation because the Flexera software wouldn't work? And where does that lead us in terms of government liability? Well, it leads us to the conclusion that the government failed to meet a required condition of its license. And the government failed to properly enable Flexera in a way that it could effectively track and limit the usage of the software. And that was an essential condition. Let's assume that the parties, and I think there's a lot of evidence to support this, that the parties thought that the Flexera software could measure usage, but that it turned out that it could only measure usage in part for part of the usage. What is the result of that? If it was impossible to use the Flexera software the way the parties had assumed? Well, certain people within the Navy, Judge Dice, did understand the use of Flexera. And ultimately, it was the Navy's responsibility to so-called flex-wrap Flexera. And it failed to do so in a way that ensured that the usage of the software would be tracked and limited. Hypothetically, suppose that what the record shows is that the parties assumed that the Flexera software would work and it didn't. And nobody knew that at the time. Where does that lead us, if that's the finding? Judge Dice, it leads us to the conclusion that there were at least 429,000 completely unrestricted copies of DF Contact Geo. And even under the government's position as to what it was permitted to do with the software, that is well beyond the scope of whatever license it could have conceivably had. So that if the government, is it your position that if the government couldn't use the Flexera as it promised, then it shouldn't have acted at all to copy? Exactly. Yes. It should have proposed something else as to how to control and limit the usage of the software. Or it should have simply made a far more limited number of copies of the software. And we have no findings on this issue from the Court of Federal Claims, right? No finding as to the issue of the failure to enable Flexera? Yeah. That's correct. The Court of Federal Claims completely disregarded this issue, even as the court relied heavily on the fact that there wasn't agreed upon use of Flexera. Although we disagree about exactly what the intended or expected purpose of the Flexera use was. But there is no dispute that Flexera didn't function, and the Court of Federal Claims completely failed to address that issue. Both parties agree, do they not, that the Court of Claims actually made a factual finding that the use of the license, that the reason he found that there was an implied license is because he found that the bit management was depending upon the government's promise to use Flexera? Yeah. The court definitely heavily relied on the expectation and agreement that Flexera would be a condition of, or would certainly be part of how the Navy's management of its licenses, the VF Contact GA, would move forward. Yes. Okay. Any more questions at the moment from the panel for Mr. Rovey? He'll have his rebuttal time. Okay. Then let's hear from the government. Mr. Bolden. Good morning, and may it please the Court. Judgment should be affirmed on implied license because the Court of Federal Claims... Mr. Bolden, can we just, since we were talking about the Flexera software, could you help us on that for a moment? I mean, it looks as though there's a situation here where both parties assumed you could use Flexera to measure all the usage. Turned out you couldn't. Where does that leave us? And if we assume that the use of Flexera was something that both parties contemplated? The first issue with respect to that, Your Honor, is that the Flexera term in the contract was a covenant as opposed to a condition. And so, according to the Court's decisions in Storage Tech and Jacobson, at most, if there was a... condition, let's assume that it was a condition of the license, which is essentially what the Court of Claims found, as a matter of fact. So, if it is, then can you answer Judge Dyke's question? Yes. Based on that, Your Honor, I do believe that the Court of Federal Claims would have to do some additional fact findings, but it appears to be a mutual mistake. It appears that BIT Management attempted to provide the Navy with a modified version of the software that would work with Flexera. Both parties believed that it was completely working with Flexera. Flexera did limit and track part of the software, but did not limit and track the remaining part of the software. What troubles me is that when the government finally concluded that the Flexera software wouldn't work, it didn't go to BIT Management and say, here's a problem, what do we do now to measure the usage? And wasn't there some sort of obligation to bring that to the attention of BIT Management and try to work out a solution? The government did bring that to BIT Management's attention, Your Honor. This may not have made its way into the joint appendix, but it wasn't discovered until 2015. By that point, the parties had already started to attempt to negotiate another license for 88 license keys, and the government brought it to BIT Management's attention, and at that point, everything fell apart. So the government did bring it to BIT Management's attention when it was discovered, and that was in 2015. At that time, the government also pulled all the usage logs for users logging in to use the SpyderCBDI. Counsel, but the government, even then, the government already knew well before it notified BIT Management that it wasn't able to use Flexera for the plug-in file at all, and when they pulled the usage, so they weren't pulling the full usage at that point in time. That's not correct, Your Honor. The government was unaware that Flexera was not limiting the web plug-in up until 2015. And what did they say? What did the government say to BIT Management at that point? The government informed BIT Management that Flexera wasn't tracking, but that they were working internally and with Planet Nine to try to determine how many uses there were by looking at how many people were using the SpyderCBDI application. But the government continued to push out the copies? Yes. At that particular time, it was being deployed on computer systems or new computers that were put on the network. There were only a certain number of active computers on the network at any particular time, but there would be computers that were retired and new computers that were put on the network. Right, so your answer is yes, they were continuing to push out copies, despite the fact that they knew that they couldn't track the usage. Yes, that is true. They knew that they could track the usage to the application that BIT Management's software had been procured in order to run, and the use of that application was less than 38 uses per day. So you're telling us that it was mutually understood, that nobody misunderstood, that after the government bought 38 licenses, the usage was unlimited? The usage was not being limited by Flexera, Your Honor. It was unlimited, period, because that's your position now, right? That there's absolutely no control, no entitlement to payment, and no understanding that this major expansion of usage would incur any obligation on the part of the government? Your Honor, there was no expansion in usage. As I mentioned, there were less than 38 logins to the Spyder's 3D website per day. So even if Flexera was not technically limiting the usage of the software, the software was just not being used by the Navy. But you don't know that, because there was no way of measuring the plug-in usage, right? Not directly, Your Honor. What do you mean, not directly? It wasn't measured at all? It was measured in the sense that the only application that the plug-in had been procured for was being used less than 38 times per day. It's also indirectly ascertained by the fact that bit management software never saw wide usage out in the public. It was giving away copies for free. I don't understand what that has to do with anything. You know, the Navy wanted to push this out through all of its systems, and so the fact that the Navy was their biggest customer and they didn't sell to a lot of other people, that has nothing to do with whether there was any kind of agreement with the Navy. Your Honor, it has to do with the demand in whether the usage of the plug-in could be tracked and whether the usage of Spyder's 3D is a fair benchmark. Yeah, but as I read the record, that when a user couldn't use the desktop app or couldn't get it to work, they would just jump on the web app. And so the failure to flex trap means that there was a totally ineffective system in place to monitor any usages. Your Honor, and so what the user would do is they would jump on the web app and they would go to the Spyder's 3D website, and that access would be tracked. But the access to the – if they were able to get it on their desktop, then that access wasn't tracked, right? If they used the desktop application, that access was tracked up until 2015. After 2015, when Flexera was removed, you couldn't even use the desktop application. At that point, you had to use the web plug-in. And again, that usage through Spyder's 3D was tracked. I don't understand that. I thought it was agreed that the plug-in usage was not tracked, that Flexera couldn't do that. It was not tracked through Flexera. It was tracked through the end use through Spyder's 3D, Your Honor. So you would use the web plug-in and you would go on the web on the Navy's intranet and go to the Spyder's 3D website. That information was tracked from roughly 2014 to 2016. The number of unique visitors per day or even non-unique visitors, the number of visits per day was tracked. So that information can be used to determine how many times bit management software was being used by the Navy. Your Honors, I'd like to quickly address the first issue that bit management brought up, which is that an exclusive or, I'm sorry, an express license precludes an implied license or implied contract. You're not contending here that there was an implied contract, if I understand it. It's just that there was an implied license, which can be granted without a contract. That's correct, Your Honor. And in fact, the implied license is perfectly understandable in this case because you have two different sets of express contracts. Neither of them directly between the government and bit management. And those express contracts do not describe what is a license. They do not describe exactly what the intended use is to be. And so essentially you have to have an implied license to breathe life into those express written contracts. That's completely different than the situation that bit management relies on. For example, the ground improvement tax case or the Normandy case, where there was an express written contract that precluded the party who was trying to assert an implied contract that was directly contradictory to those express contracts. So are you interpreting the written contracts to say that the written contracts don't provide enough information? I mean, that doesn't mean that they're not relating to the same topic area. The written contracts are ambiguous, Your Honor, and they broadly relate to the same topic of bit management software. But the contracts don't describe what kind of licenses are being procured and how those licenses are to be deployed. Well, is it the methodology to deal with that, to amend the written contracts if there's some confusion? Your Honor, that doesn't always happen. And there were several times that bit management themselves amended what they would do. They delivered different kinds of software than what was specified in the contracts. The parties had been working and collaborating for years before the contracts, during deployment, then even after deployment. And all of that was taken into consideration by the Court of Federal Claims. So you have to look at the totality of the circumstances, and that's exactly what the Court of Federal Claims did, and its approach was not clearly erroneous on that. But isn't the question of whether there's an implied license, isn't that a question of law that turns on underlying facts, but it's still a question of law? Ultimately, Your Honor, if the court applied the wrong standard, for example, if the Court of Federal Claims felt that this was not an affirmative defense and pushed the burden on to bit management, then that would be an issue of law. That is something that bit management asserted in their opening brief, but it did not seem to be addressed in their reply brief. And so it does not appear that there are any issues of law with respect to the implied license at this particular point, the second issue raised in the brief. I'd also like to mention that the situation here is very much akin to the court's decision in the storage tech case. In that particular case, there was a written license between the copyright owner and between the customers, and the customer's agent was able to assert that there was an implied license for the use that it made because the written license didn't expressly preclude the copyright right. You're attempting now to say that what the claims court really did was say that there was an ambiguity in the written documents, and so they were using parole evidence to interpret those documents, but that's not what the court did. It found a separate implied license, right? That is what the court found? It didn't say it was interpreting the written contracts. That's correct, Your Honor. I think that either approach gets you to the exact same spot. Except for you do have the problem that you're not supposed to have an implied contract or implied license in the face of a written contract, right? That's correct. Although, again, there's no privity between the government and BIT management. That's because the government didn't want there to be direct privity, right? But the government understood it was working directly through an agent at its own request. Planet Nine was not the agent of either party. The Court of Federal Claims expressly found that Planet Nine was not BIT management's agent. That's on page three of the appendix, and that was based on a stipulation between the parties, and the record shows that Planet Nine played an important role. It wasn't the agent of either party. Planet Nine provided advice and recommendations to BIT management. It helped negotiate the terms of the proposal. And at the end of the day, Your Honor, Planet Nine understood that all parties understood that BIT management had provided the Navy with flex or floating licenses. That's on pages 1693 and 1709 to 1710. Can you cite any case where the word privity is actually used in the context of assessing whether you can have an implied agreement in the face of a written express contract on the same subject matter? Your Honor, we're not saying that privity is an absolute rule, and as far as the cases, we cite the Hawkins case, the Supreme Court case from the 1870s, which talks about an agreement between the parties. That language of an agreement between the parties has been in many of the cases that we cite. It's in the Skiffen case as well. It's in Lee. Are you saying that BIT management wouldn't be a third-party beneficiary of Planet Nine's agreement with the Navy? What we're saying, Your Honor, is that the issue of privity is a consideration that has to be taken into account, along with what's in the contract, the language that's in the contract, the relationship between the parties. It's essentially the totality of circumstances, and privity is one of those things. If BIT management was a third-party beneficiary, that might have an effect, but at the end of the day, it's overall course of conduct, it's interactions, the things that the Court of Federal Claims cited and relied upon to reach its conclusion that are controlling. I understand that my time is up, so unless there are any further questions, we ask that judgment be affirmed. Thank you. Any more questions for Mr. Bolden? No, thank you. No. Okay, thank you. All right, Mr. Aviv, you have your rebuttal. Mr. Aviv? Are you there? Can you hear us? We don't hear you. Yes, apologies, Your Honor. Thank you. On the last point that we were discussing with Mr. Bolden, this Court, as we've explained, in the ground improvement case, in the Normandy apartment case, and courts in numerous other jurisdictions have applied the rule requiring preclusion in cases where there was not necessarily direct privity between the parties to the alleged implied agreement. But you have at least one case in the Fifth Circuit, the Lularama case, which doesn't deal with separate contracts, but says that you can have an agreement, an express agreement, but still have an implied license that is granted apart from the agreement, right? Well, Judge Dike, in that case, the reason why the Court reached that conclusion, the Lularama case, is because the subject matter of the alleged implied license was pretty far afield from the matter of the express contract. There was a serious question whether the copyrighted works that were covered by the express contract were actually covered by the implied license. And in the ground improvement case and the Normandy apartment case decided by this Court, both of those cases actually involved, if anything, more attenuated relationships between the parties to the alleged implied contract than we have here. I mean, here... Those cases didn't involve implied licenses. They involved implied contracts, right? Yes, that's correct. Yes. If there's any case where this rule should apply, even in the lack of direct privity between the parties, it's this one. I mean, the Court... The government literally insisted that bit management contracts with a third party who would act solely as an intermediary or a conduit. Bit management is entirely prepared to contract directly with the government. The government refused to do so for technical or legal reasons that were never fully explained. And if I may, Your Honours, before my time is up, I'd like to address the question of usage that you were discussing with Mr Bolden. The weblogs that Mr Bolden alluded to are a completely inadequate picture of the usage of the ex-contract geo. For one reason, it's because there were no weblogs available for the first 14 months after the mass deployment began. So we have no data, or there's no way to get any data, on how much the ex-contract geo was used shortly after it was massively deployed and during which one would expect that the usage would be at the highest. The second point... Don't we need the Court of Federal Claims to address that issue since we don't have any findings and you're arguing opposite positions on it from the record? We may need findings on that issue, Judge Drake. That's correct. And in addition, if I may, there is no record whatsoever from either Flexera or the weblog as to the use of the ex-contract geo outside of the context of Spriter 3D. And ex-contract geo is fully functional. It would be used anytime any person navigated to a website that contained a certain type of formatted file called an XGB file. In such a case, ex-contract geo would automatically launch. So the government had the benefit of these hundreds of thousands of copies with absolutely no way to track or limit their usage for the period throughout which all those copies were installed onto the Navy's entire U.S. network.  what is your response to the government's argument that what really happened here was a mutual mistake of fact? Well, ultimately, it was the government's responsibility, as noted in the language of the 2012 contract that Navy executed, to so-called enable Flexera. And the government itself has acknowledged that Flexera was not properly enabled. And at trial, Your Honor, it was clear that certain of the Navy's technical experts were aware of what the limitations of Flexera were and probably were aware throughout this period. The problem is that the people who were negotiating on behalf of the Navy and were making representations that Flexera could be used had no appreciation of the limitations of Flexera. Wouldn't mutual mistake void any contract, even an implied one? Not necessarily, Your Honor. In this case, where one party is the one who is responsible for that mistake and has full control over whether the promised means of limiting the usage of the software would be effective, that party should not be able to get out of it simply by voiding whatever agreement they might have had. And in particular here, where at the Navy's insistence, it managed to take its own standard licensing protection mechanism with the assurance that it would not be necessary because Flexera would take its place as a means of helping to protect the management rights with respect to copying and distribution and use of its software. Any more questions for Mr. Aviv? No, thank you. Okay, do you have a last word for us, Mr. Aviv? Your Honors, based on the arguments that's made, we respectfully request that the Federal Circuit reverse and remand. Okay, thank you. Thanks to both counsel. The case is taken into submission.